UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CV 02895

FRANK MATASSA, Individually And
On Behalf of All Others Similarly Situated,

            Plaintiff,

vs.

MF GLOBAL LTD, MAN GROUP PLC,
EDWARD L. GOLDBERG, AMY S. BUTTE
ALISON J. CARNWATH, KEVIN R. DAVIS,
CHRISTOPHER J. SMITH, MERRILL LYNCH,
PIERCE, FENNER & SMITH INC.,
CREDIT SUISSE SECURITIES (USA) LLC,
CITIGROUP GLOBAL MARKETS INC.,
J.P. MORGAN SECURITIES INC.,
LEHMAN BROTHERS INC. ,
UBS SECURITIES LLC,
GOLDMAN, SACHS & CO.,
MORGAN STANLEY & CO. INC., and
DEUTSCHE BANK SECURITIES INC.

            Defendants.

CIVIL ACTION NO. _____

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS



RECEIVE
MAR 19 2008
U.S.D.C. S.D. N.Y.
CASHIERS

JURY TRIAL DEMANDED

## NATURE OF THE ACTION

1.     This is a class action brought on behalf of the purchasers of the common stock of MF

Global Ltd. ("MF Global" or the "Company") pursuant to its July 20, 2007 Initial Public Offering

("IPO" or the "Offering") of 97.379 million shares of common stock. In connection with this

Offering – all shares of which were sold by MF Global's corporate parent, Man Group, Plc. ("Man

Group") [1] – defendants raised gross proceeds of at least $2.921 billion – not including another

_____

1 In total, the Man Group sold at least 107.116 million shares of MF Global common stock – including an

$292.11 million in Company stock sold in connection with the IPO pursuant to the underwriters' over-subscription option agreement, for gross proceeds of at least $3.213 billion – all of which was paid to defendant Man Group.

2.       MF Global, its entire Board of Directors, its Chief Financial Officer, the Man Group, and the lead underwriters involved in the Offering (including Citigroup Global Markets Inc., ("Citigroup"), J.P. Morgan Securities Inc. ("J.P. Morgan"), Lehman Brothers Inc. ("Lehman Bros."), Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), UBS Securities LLC ("UBS"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Deutsche Bank Securities Inc. ("Deutsche Bank), Goldman, Sachs & Co. ("Goldman Sachs"), and Morgan Stanley & Co. Inc. ("Morgan Stanley")}, are each charged with including or allowing the inclusion of materially false and misleading statements in the Registration Statement and Prospectus issued in connection with the IPO, in direct violation of the Securities Act of 1933. Specifically, defendants each failed to conduct an adequate due diligence investigation into the Company prior to the IPO and they also each failed to reveal, that at the time of the IPO, the Company lacked the most basic risk management and trading risk safeguards.

3.       It was only on February 28, 2008, however - after defendant Man Group sold over $3.213 billion of its own stock in connection with the IPO – that MF Global revealed the truth about the Company, including that its risk monitoring, management, and control systems were so deficient or non-existent that an employee trader, trading for his own account, had accumulated almost $150 million in unauthorized trading losses in a period of less than 24 hours.

---

additional 9.737 million shares sold by underwriters pursuant to an over-subscription option agreement granted to them by Man Group.

4.      That day, as investors realized the weakness of the Company's risk monitoring and loss prevention systems and that these conditions placed the entire Company at substantial risk of loss, and after investors calculated that this single event had wiped out half of MF Global's earnings for the entire year, MF Global stock price collapsed. As evidence of this, shares of MF Global fell over 25% in a single trading day – plummeting over $8.00 per share to close at just over $21.00 per share on February 28, 2008. That trading day, MF Global also experienced exceptionally heavy trading volume with over 15.74 million shares traded – many times the Company's recent average daily trading volume. The following day, as the Company was downgraded by the major ratings agencies, shares of MF Global fell an additional 20%, from a prior day's close of $21.00, to a trading low of $14.00 per share – down another $7.00 per share.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under §§11, 12(a)(2), and 15 of the Securities Act, §§77k and 77o, and rules promulgated thereunder by the Securities and Exchange Commission (the "SEC").

6.      Jurisdiction is conferred by §22 of the Securities Act of 1933. 15 U.S.C. §77v.

7.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(d) and because MF Global and Man Group are both foreign or "alien" corporations or entities that do significant business in this District, and may properly be sued in any District of the United States, including the Southern District of New York.

8.      Venue is also proper pursuant to §22 of the Securities Act because the Underwriter Defendants – Citigroup, J.P. Morgan, Lehman Bros., Merrill Lynch, UBS, Credit Suisse, Deutsche

3

Bank, Goldman Sachs, and Morgan Stanley – each conduct business in, and the wrongful conduct took place in, this district.

9.   In connection with the acts alleged in this complaint, defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

### Plaintiff

10.   Plaintiff **FRANK MATASSA** purchased shares of MF Global common stock pursuant and/or traceable to the Company's materially false and misleading registration statement and prospectus issued by defendants in connection with the July 2007 IPO, including those shares detailed in the attached Certification, incorporated herein by reference, and was damaged thereby.

### Corporate Defendants

11.   Defendant **MF GLOBAL** is a Corporation organized under the laws of Bermuda, with its chief executive offices purportedly located in Hamilton, Bermuda at Clarendon House, 2 Church Street, Hamilton. According to a description of the Company's business, hosted on Internet financial news site Yahoo! Finance, MF Global operates as a broker of exchange-listed futures and options worldwide, providing execution and clearing services for exchange-traded and over-the-counter derivative products, as well as for non-derivative foreign exchange products and securities in the cash market.  The Company also purports to offer trade execution and clearing services for derivative and cash products across a range of trading markets, including interest rates, equities, currencies, energy, and metals, as well as agricultural and other commodities, servicing

4

approximately 130,000 active client accounts, including institutions, hedge funds, other asset managers, professional traders, and private clients. The Company also markets and sells its products through three primary distribution channels including: (i) employee brokers; (ii) introducing brokers; and (iii) on-line platforms.

12.    Defendant **MAN GROUP** was the corporate parent of the Company and is a public company listed on the London Stock Exchange which has its principal address in the United Kingdom at Sugar Quay, Lower Thames Street, London, EC3R 6DU. According to the Company's IPO prospectus, prior to the IPO, Man Group was the beneficial owner of all of the common shares of the Company and Man Group directly or through its subsidiaries retained at least 18.6% of the Company's shares thereafter. In connection with Man Group's initial sale of 97.4 million shares and later with its sale of an additional 9.74 million shares, Man Group realized gross proceeds of over $3.213 billion. Moreover, immediately following the IPO and following the creation of a public market for shares of MF Global, Man Group's remaining investment in the Company was immediately valued at approximately $525.96 million.

## Individual Defendants

13.    The individuals identified as defendants in subparagraphs (a) - (e) below are referred to collectively herein as the "Individual Defendants." The Individual Defendants are each liable for the false statements contained in the materially false and misleading Registration Statement and joint Prospectus, as alleged herein, as those statements were "group-published" information. The Individual Defendants include the following:

(a)    Defendant **KEVIN R. DAVIS** ("Davis") is, and at the time of the IPO was, Chief Executive Officer and member of the Board of Directors of MF Global. Defendant Davis

5

signed the materially false and misleading registration statement and filed with the SEC the materially false and misleading prospectus issued in connection with the July 2007 IPO. Moreover, in exchange for defendant Davis' purported loyalty, fidelity, and diligence and in consideration for his purported strong management skills and abilities, during 2007 defendant Davis was paid over $17.68 million in performance-based salary and bonuses;

(b)    Defendant **CHRISTOPHER J. SMITH** ("Smith") is, and at the time of the IPO was, Chief Operating Officer, Deputy Chief Executive Officer, a member of the Board of Directors, and a member of the Audit Committee of the Board of the Company. Defendant Smith signed the materially false and misleading registration statement and filed the materially false and misleading prospectus issued in connection with the July 2007 IPO with the SEC. Moreover, in exchange for defendant Smith's purported loyalty, fidelity, and diligence and in consideration for his purported strong management skills and abilities, during 2007 defendant Smith was paid over $10.107 million in performance-based salary and bonuses;

(c)    Defendant **AMY S. BUTTE** ("Butte") is, and at the time of the IPO was, Chief Financial Officer, a member of the Board of Directors, and a member of the Audit Committee of the Board of the Company. Defendant Butte signed the materially false and misleading registration statement and filed the materially false and misleading prospectus issued in connection with the July 2007 IPO with the SEC. Moreover, in exchange for defendant Butte's purported loyalty, fidelity, and diligence and in consideration for his purported strong management skills and abilities, during 2007 defendant Butte was paid over $4.61 million in performance-based salary and bonuses;

(d)    Defendant **ALISON J. CARNWATH** ("Carnwath") is, and at the time of the

6

IPO was, the non-Executive Chairman of the Board of Directors and a member of the Audit Committee of the Board of the Company. Defendant Carnwath signed the materially false and misleading registration statement and filed the materially false and misleading prospectus issued in connection with the July 2007 IPO with the SEC;

(e)  Defendant **EDWARD L. GOLDBERG** ("Goldberg") is, and at the time of the IPO was, a member of the Board of Directors of the Company. Defendant Goldberg signed the materially false and misleading registration statement and filed the materially false and misleading prospectus issued in connection with the July 2007 IPO with the SEC.

## Underwriter Defendants

14.  In connection with the July 2007 IPO, defendant **CITIGROUP**, defendant **J.P. MORGAN**, defendant **LEHMAN BROS**, defendant **MERRILL LYNCH**, defendant **UBS**, defendant **CREDIT SUISSE**, defendant **DEUTSCHE BANK**, defendant **GOLDMAN SACHS** and defendant **MORGAN STANLEY** were investment banks that acted as lead underwriters, joint book-running agents, or underwriters of the Offering -- distributing over 97.379 million shares of MF Global stock to investors and initiating the first public market for MF Global shares (in addition to selling 9.737 million shares distributed upon exercise of the underwriters' over-subscription option). Excluding the over-subscription option granted by Man Group, the distribution of the MF Global shares awarded underwriters in the IPO occurred as follows:

| UNDERWRITER DEFENDANTS | Number of Shares |
|---|---|
| Citigroup Global Markets Inc. | 12,827,962 |
| J.P. Morgan Securities Inc. | 12,827,959 |
| Lehman Brothers Inc. | 12,827,959 |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 12,827,959 |
| UBS Securities LLC | 12,827,959 |

7

| | |
|---|---|
| Credit Suisse Securities (USA) LLC | 4,581,414 |
| Deutsche Bank Securities Inc. | 4,581,414 |
| Goldman, Sachs & Co. | 4,581,414 |
| Morgan Stanley & Co. Inc. | 4,581,414 |
| ABN AMRO Rothschild LLC | 1,308,975 |

| Total Underwriter Defendants | 83,774,429 |
|---|---|

**ADDITIONAL NON-PARTY UNDERWRITERS**

| | |
|---|---|
| Banc of America Securities LLC | 1,308,975 |
| BMO Capital Markets Corp. | 1,308,975 |
| HSBC Securities (USA) Inc. | 1,308,975 |
| Keefe, Bruyette & Woods, Inc. | 1,308,975 |
| Sandler O'Neill & Partners, L.P. | 1,308,975 |
| Wachovia Capital Markets, LLC | 1,308,975 |
| Blaylock & Co., Inc | 213,018 |
| C L King & Associates, Inc. | 213,018 |
| Chatsworth Securities LLC | 213,018 |
| Calyon Securities (USA) Inc. | 213,018 |
| Dowling & Partners Securities, LLC | 213,018 |
| E*TRADE Securities LLC | 213,018 |
| Oppenheimer & Co. Inc. | 213,018 |
| Fortis Securities LLC | 213,018 |
| Guzman & Co. | 213,018 |
| ING Financial Markets, LLC | 213,018 |
| Jefferies & Co., Inc. | 213,018 |
| Lazard Capital Markets LLC | 213,018 |
| M.R. Beal & Co. | 213,018 |
| Mizuho Securities USA Inc. | 213,018 |
| Muriel Siebert & Co., Inc. | 213,018 |
| Raymond James & Associates, Inc. | 213,018 |
| RBC Capital Markets Corp. | 213,018 |
| Robert W. Baird & Co. Inc. | 213,018 |
| Samuel A. Ramirez & Co., Inc. | 213,018 |
| SMH Capital Inc. | 213,018 |
| Stifel, Nicolaus & Co., Inc. | 213,018 |
| SunTrust Capital Markets, Inc. | 213,018 |
| The Williams Capital Group, L.P. | 213,018 |
| Piper Jaffray & Co. | 213,018 |
| Utendahl Capital Partners, L.P. | 213,018 |
| Wells Fargo Securities, LLC | 213,018 |
| William Blair & Co., L.L.C. | 213,018 |

| Total Non-Party Underwriters | 13,605,336 |
|---|---|

| TOTAL ALL UNDERWRITERS | 97,379,765 |
|---|---|

8

15.     In connection with the July 2007 IPO, the Underwriter Defendants were paid over $96.405 million in gross fees – paid indirectly by purchasers of the Company's shares. The Underwriter Defendants were paid at least $0.90 per share in connection with the sale of the 107.116 million shares, including shares sold pursuant to the exercise of the underwriter's over-subscription option, as follows:

|  | Per Share | Without Option | With Option |
|---|---|---|---|
| Public offering price | $ 30.00 | $ 2,921,392,950.00 | $ 3,213,532,260.00 |
| Underwriting discount | $ 0.90 | $ 87,641,788.50 | $ 96,405,967.80 |
| Proceeds, before expenses, to insiders | $ 29.10 | $ 2,833,751,161.50 | $ 3,117,126,292.20 |

16.     Shareholders paid over $96.40 million in combined fees to compensate the Underwriter Defendants for conducting a purported significant "due diligence" investigation into MF Global in connection with the IPO. The Underwriter Defendants' due diligence investigation was a critical component of the IPO was supposed to provide investors with important safeguards and protections.

17.     The due diligence investigation that the Underwriter Defendants were required to perform mandated a detailed investigation into MF Global sales, accounting, controls, procedures and it also required defendants to test the assumptions and verify the projections adopted or ratified by defendants, to the extent a reasonable investor with access to such confidential corporate information would. A reasonable due diligence investigation would have extended well beyond a mere casual view of MF Global books and records, and its accounting, financial reports, and

9

operational and financial controls. The failure of the Underwriter Defendants to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

18.    In addition to the foregoing, because of the Underwriter Defendants' and Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about MF Global's business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets, and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

19.    In addition to the Underwriter Defendants, it is also appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were also involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and

10

information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

20.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, was traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions made in connection with the issuance of common stock in July 2007 violated these specific requirements and obligations.

21.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company at the time of the Offering.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

11

## MATERIALLY FALSE & MISLEADING STATEMENTS
## IN THE REGISTRATION STATEMENT AND PROSPECTUS

22.     On June 21, 2007, defendants published a release announcing that they had priced the

IPO of over 97.4 million shares of MF Global within a range of between $36.00 and $39.00 per

share. At that time, defendants published a release that stated, in part, the following:

> MF Global Announces Price Range for its Initial Public OfferingNEW YORK, June
> 21, 2007 · MF Global Ltd. (currently operating through Man Financial Ltd, Man
> Financial Inc. and other subsidiaries of Man Group plc) today filed with the U.S.
> Securities and Exchange Commission (SEC) an amendment to its registration
> statement on Form F-1 for the initial public offering of its common shares. The
> estimated price range for the initial public offering is $36 to $39.
>
> Man Group plc (LSE:EMG) currently plans to offer 97.4 million common shares of
> MF Global, representing approximately 80% of the outstanding share capital. Man
> Group has also granted the underwriters an option to purchase up to 9.7 million
> additional common shares of MF Global in the offering.
>
> On March 30, 2007 Man Group announced its intention to separate Man Financial,
> its brokerage business, through an initial public offering. Man Financial will be
> renamed MF Global upon completion of the separation and IPO. MF Global's
> common shares have been approved for listing on the New York Stock Exchange
> under the ticker symbol "MF."
>
> Citi, JPMorgan, Lehman Brothers, Merrill Lynch & Co. and UBS Investment Bank
> are serving as joint book-running managers for the offering. The joint lead managers
> are Credit Suisse, Deutsche Bank Securities, Goldman, Sachs & Co. and Morgan
> Stanley. Other co-managers include ABN AMRO Rothschild LLC, Banc Of America
> Securities LLC, BMO Capital Markets, HSBC, Keefe, Bruyette & Woods, Sandler
> O'Neill + Partners, L.P., and Wachovia Securities. Lazard is acting as a financial
> advisor to MF Global in the matter.
>
> The offering will be made only by means of a prospectus. Copies of the preliminary
> prospectus may be obtained by contacting any of the joint book-running managers
> whose contact information is listed below.
>
> A registration statement relating to these securities has been filed with the SEC but
> has not yet become effective. These securities may not be sold nor may offers to buy
> be accepted prior to the time the registration statement becomes effective...

23.    Later, however, on July 18, 2007, defendants announced that they had lowered that

range and had priced the shares at $30.00 per share. At that time, defendants again published a

release which stated, in part, the following:

> MF Global Announces Pricing of $2.9 Billion Initial Public Offering
>
> NEW YORK--(BUSINESS WIRE)--July 18, 2007--MF Global Ltd. today announced
> that its initial public offering of 97.4 million shares of its common stock has been
> priced at $30 per share. MF Global's common shares are expected to begin trading
> tomorrow, July 19, 2007, on the New York Stock Exchange under the ticker symbol
> "MF."
>
> All of the shares, representing approximately 80% of the outstanding share capital,
> will be offered by Man Group plc (LSE:EMG), which is separating its brokerage
> business, formerly Man Financial, through the IPO. Man Group has granted the
> underwriters an option to purchase up to 9.7 million additional common shares of
> MF Global in the offering.
>
> Concurrent with the separation and IPO, Man Financial has been renamed MF
> Global.
>
> Citi, JPMorgan, Lehman Brothers, Merrill Lynch & Co. and UBS Investment Bank
> are serving as joint book-running managers for the offering. The joint lead managers
> are Credit Suisse, Deutsche Bank Securities, Goldman, Sachs & Co. and Morgan
> Stanley. Other co-managers include ABN AMRO Rothschild LLC, Banc Of America
> Securities LLC, BMO Capital Markets, HSBC, Keefe, Bruyette & Woods, Sandler
> O'Neill + Partners, L.P., and Wachovia Securities. Lazard is acting as a financial
> advisor to MF Global in the matter.
>
> Copies of the prospectus may be obtained by contacting any of the joint book-running
> managers whose contact information is listed below.

24.    Also on July 18, 2007, MF Global commenced this Offering of approximately 97.4

million shares at $30.00 each. The next day, July 19, 2007, Company shares opened for trading at

slightly less than $30.00 per share, and by the end of the first day of trading shares of the Company

settled at $27.55 per share. During the first day of trading, over 46 million MF Global shares traded.

At the offering price of $30.00 per share, defendant Man Group was able to reap gross proceeds of

approximately $2.922 billion -- approximately $238.63 million more than the value of that same

13

shares following the end of their trading debut. At that time, however, as the market for these shares was initiated, Man Group's remaining interest in the Company had a market value of over $500 million.

25.     Thereafter, on July 20, 2007, defendants filed the Company's IPO prospectus with the SEC pursuant to Form 424B4. In addition to making many other statements that purported to describe the Company's operations and financial results, the IPO prospectus also elaborated on the nature of this spin-off transaction and the relationship, both past and ongoing, that existed between MF Global and its former parent, Man Group. In this regard, the IPO prospectus stated, in part, the following:

## THE REORGANIZATION, SEPARATION AND RECAPITALIZATION TRANSACTIONS AND OUR ORGANIZATIONAL STRUCTURE

Pursuant to a series of transactions undertaken in connection with the Reorganization and Separation, Man Group separated its brokerage business, referred to as the "brokerage division", from its asset management business, referred to as the "asset management division". Thereafter, we acquired control over the operations and management of the brokerage division. These transactions, as well as our organizational structure after giving effect to these transactions and this offering, are described below.

### The Reorganization and Separation Transactions

#### *The Reorganization*

*Prior to the Reorganization, Man Group conducted our business—its brokerage division—and its asset management business through numerous direct and indirect subsidiaries, and each division operated autonomously from one another. In recent months, through a series of transactions, Man Group reorganized its corporate structure to separate its brokerage division from its asset management division. The brokerage division, which Man Group historically operated under the name Man Financial, consists of all of our business, comprised of execution and clearing services for derivatives and cash products in financial markets throughout Europe, North America and the Asia/Pacific region.*

14

The Reorganization was effected by, among other things, transferring all of the entities and assets of Man Group that comprise our business to Man Financial Overseas Ltd. and ED&F Man Group Ltd., holding companies incorporated in the United Kingdom. MF Global Finance USA Inc. and a newly formed Delaware corporation, MF Global Finance North America Inc., function as our U.S. finance subsidiaries, and we intend to form additional unregulated finance subsidiaries. *We refer to this series of transactions as the "Reorganization".* Man Group recently completed all the stock and asset transfers contemplated by the Reorganization.

26.     The IPO prospectus further described "The Separation" of MF Global from its parent,

Man Group, in part, as follows:

### The Separation

*Following the completion of the Reorganization, Man Group completed the separation of our business from Man Group's asset management division,* transferring all of the outstanding capital stock of Man Financial Overseas Ltd., ED&F Man Group Ltd., Man Financial (S) Pte Ltd. and Man Financial Holdings (HK) Ltd. to us. In exchange for full ownership of these transferred entities, we issued 103,726,353 of our common shares to the Man Group selling shareholder, which represented all of our issued and outstanding share capital at the time (other than the 100 common shares we issued to the Man Group selling shareholder in connection with our formation and the additional shares subsequently issued to the Man Group selling shareholder in the Recapitalization as described below). We refer to this transaction as the "Separation." **As a result of the Separation, we now own, directly or indirectly, all of the brokerage division.** Following the completion of these transactions, we will rename ED&F Man Group Ltd., Man Financial Overseas Ltd., Man Financial Holdings Limited and Man Group USA Inc. as MFG Europe Holdings Limited, MFG Overseas Holdings Limited, MFG Overseas Limited and MFG US Holdings Inc., respectively. See "—Organizational Structure" below. Prior to this offering, we were wholly owned by Man Group. Following this offering, Man Group will retain a 18.6% ownership interest in MF Global.

In connection with these transactions, we and several of our subsidiaries have entered into several transitional services agreements and other agreements with Man Group, which govern our Separation from Man Group and the *ongoing business relationships* between us. The principal agreements include the following:

- Master Separation Agreement
- Trademark Agreement
- Insurance Services Agreement

15

- Tax Matters Deed
- **Group Risk Services Agreement**
- Treasury Services Agreement
- PAAF Indemnity

[Emphasis added.]

27.    Defendants further described the relationship of MF Global and Man Group, in part,

as follows:

### Relationship with Man Group

*Prior to this offering, we operated as a division of Man Group and were known as "Man Financial".* Man Group is a public company incorporated in the United Kingdom whose shares are listed on the London Stock Exchange. In addition to its brokerage division, Man Group operates an asset management division, known as "Man Investments."…

For many years, we have provided services to a large number of collective investment vehicles or investment products for which *Man Investments Limited acts as investment manager, investment adviser or in other capacities.* These investment products are independently governed legal entities— they do not form part of, nor are they controlled by, Man Investments Limited or Man Group. *We also provide execution and clearing services to Man Group itself and certain of its subsidiaries.* We provide these services to the independent investment products and to Man Group on an arm's-length commercial basis and we expect to continue to provide these services on substantially the same basis following this offering. See "—Ongoing Commercial Relationship with Man Group" below.

*Historically, Man Group has provided financial and administrative support to us. In connection with this offering, we entered into several transitional services agreements with Man Group pursuant to which Man Group agreed to continue to provide us with administrative support for certain corporate functions, such as corporate-level coordination and support services related to our global risk-management activities,* tax administration, corporate secretarial services and insurance management, for a limited transition period….

[Emphasis added.]

28.    Regarding the purported "Ongoing Commercial Relationship with Man Group," the

IPO prospectus also stated, in part, the following:

### Ongoing Commercial Relationship with Man Group

As discussed above, we have for many years provided execution and clearing services for a number of independent investment products managed by Man Investments Limited, a part of the Man Investments division of Man Group. In the past, we have generally provided these services with respect to all investment products that were either wholly or in part managed through Man Investments' managed futures program, which is *an automated and diversified managed futures trading program operated by Man Investments*. The services that we provide for these independent investment products have been an important source of revenues for us, accounting for approximately 2.8% of our revenues, net of interest and transaction-based expenses, for fiscal 2007. These brokerage services, together with the brokerage services we provide to several investment products managed by entities that are partially owned by Man Group, represent a substantially greater percentage, which we estimate to be approximately 10-15%, of our adjusted income before taxes. We have provided these brokerage services under various arrangements for many years. We recently entered into new clearing agreements relating to the relevant investment products. For these purposes, "relevant investment products" are investment products in existence at March 31, 2007, which have an allocation to Man Investments' managed futures program and in respect of which clearing broker accounts have been opened with us.

\*  \*  \*

*We have previously acted and expect to continue to act as a distributor of Man Investments' investment products.* Several of our subsidiary companies have entered into distribution agreements with Man Investments. These agreements, which will continue following completion of this offering, enable us to earn commissions on the sale of Man Investments' investment products and, we believe, are subject to arm's-length commercial terms similar to those entered into by Man Investments with unrelated parties who act as distributors of the same products. In general, these distribution agreements may be terminated by either party upon not less than one month's written notice. In addition, Man Investments may terminate the agreement upon the occurrence of certain breaches by our subsidiary, the insolvency of our subsidiary or for our subsidiary's lack of requisite governmental or regulatory authority to provide its services. *Generally, our subsidiaries agree to indemnify Man Investments for any claims or losses arising from their acts or omissions under the relevant distribution agreement.*

[Emphasis added.]

17

29.    Among other purported advantages, the spin-off of MF Global from its former parent

Man Group was also to provide the Company with purported advantages such as additional "Risk

Management" controls and procedures. As evidence of this, the IPO prospectus also stated, in part,

the following:

**Group Risk Services Agreement**

*We have historically relied on Man Group to provide us with enterprise-level oversight of our global risk-management operations. Following this offering, we intend to manage our global risk-management activities on a stand-alone basis with our own personnel. To this end, we have entered into a group risk services agreement with Man Group pursuant to which Man Group has agreed to provide us with a license to use its global risk- management systems and processes it has used historically to provide us with these services.* These systems and processes will allow us, among others things, to:

*   *calculate the economic capital required for various risk categories associated with our business at specified confidence levels,* as well as the overall level of economic capital of our business;

*   *carry out and produce a report relating to stress-testing of our business* as part of the Internal Capital Adequacy Assessment Process documentation requirements;

\*   *prepare reports* supporting Internal Capital Adequacy Assessment Process;

\*   prepare annual liquidity scenarios and test our liquidity contingency plan; and

*   *provide training in respect of credit aggregation and limit monitoring systems.*

*Pursuant to the group risk services agreement, Man Group will also agree to provide ongoing risk-management support and consulting services to us for a period of 12 months following this offering.* We have agreed to pay Man Group an annual fee of $120,000 plus an *aggregate fee of $160,000 per month,* plus any interest for late payments, for the group risk services. *In fiscal 2007, we paid Man Group approximately $3.5 million in the aggregate for global risk management services provided to us.*

[Emphasis added.]

18

30.     The IPO prospectus also described the Company's purported "Competitive

Advantages," many of which were supposed to have resulted from MF Global's prior association

with Man Group, in part, as follows:

### Our Competitive Strengths

The derivatives and cash brokerage industry is fragmented and highly competitive. Our competitors include hundreds of brokers and banks around the world. See "— Competition". We compete in trade execution primarily with other brokers. In addition, in recent years several major exchanges have increasingly permitted clients to execute derivatives trades directly on exchanges by electronic means. We compete in clearing with many other clearing firms, primarily commercial banks and other financial institutions with ready access to capital and large lending operations. In addition, major exchanges provide clearing services to brokers and directly to some large financial institutions for derivatives trades.

### *We have maintained our leadership in the derivatives and cash brokerage industry due to our principal strengths, which include:*

### *Leading Specialty Broker*

We believe that we are the leading specialty broker operating in most of the trading markets around the world in which we operate. We believe that our focus on providing superior brokerage execution and clearing services attracts clients and enables us to develop strong, broad relationships with them. *As a specialty broker, we generally do not trade for our own account,* except to facilitate client trades on a matched-principal basis and to hedge the foreign currency and interest rate risk inherent in our global operations, and we do not maintain an inventory of financial products. *When we trade on a matched-principal basis,* we execute a client's order by entering into the requested trade with the client and contemporaneously (often within minutes and generally on the same trading day) entering into an offsetting trade with another party, thereby minimizing our exposure to market-price movement. *We generally do not engage in directional trading, meaning that we do not take positions for our own account in order to profit from anticipated changes in market prices.* (In addition to matched-principal trades for clients, we engage in principal transactions to hedge our exposure to changes in foreign currency exchange rates and interest rate risk.) *Limiting our principal trading in this manner helps us to avoid conflicts of interest with our clients and promotes financial stability in our operations.* As a result, we believe our clients are more inclined to trade through us and to maintain funds on account with us than if we engaged in non-brokerage businesses like many of our competitors.

19

\*  \*  \*

### Integrated, Diversified Business Model

Our business model affords us the resources and flexibility to respond quickly to changing client demands and market conditions, and to serve multiple types of clients, from banks, corporations and other institutions, to hedge funds and other asset managers, to professional traders and private clients. *Our diversified operations also promote balanced and stable performance for our business.* We are not dependent on any single product, trading market, region or type of client and we believe this diversity and our focus on derivatives brokerage helps to mitigate— although not eliminate  the volatility of revenues and earnings that brokers can experience.

### Well Established Reputation

We have our origins over 200 years ago in a broking business founded by James Man. Our parent company, Man Group, is listed on the London Stock Exchange and is a constituent of the FTSE 100 Index. *We believe that our reputation within the financial community is among our most valuable assets.* We have also benefited from an experienced and talented employee base that we believe to be stable and loyal. We and Man Group have been operating internationally since inception. This experience, including more than 12 years of operating as a division of a public company in the United Kingdom, has shaped a culture at MF Global that is familiar with operating a global business in a public-company environment. We also believe we have good, and in many cases, longstanding, relationships with our regulators and a record of effective compliance with the regulations that govern our operations around the world.

*In addition, we have inherited a strong tradition of corporate social responsibility from Man Group and believe that maintaining a corporate responsibility program is integral to building and preserving our corporate reputation and brand. We intend to continue to uphold the highest levels of ethics, integrity and accountability as a good corporate citizen, both through our operating practices and social responsibility programs.* We believe that by doing the right thing for all our stakeholders—shareholders, employees, clients and communities, both locally and globally—we will build a level of trust, loyalty and goodwill that will further enhance our long-term position in the marketplace.

\*  \*  \*

20

*Access to Advanced Technology Platform*

*Our advanced execution and clearing systems enable our clients to trade rapidly, efficiently and reliably across major global markets,* which enables us to compete effectively in multiple trading markets around the world. We are generally an integrator, and not a developer, of technology. By licensing the technology in our core systems from leading independent vendors such as Rolfe & Nolan and SunGard, *we have access to advanced and reliable technology.* By integrating different third-party technologies, *we are able to respond quickly to technological change by upgrading our systems with limited capital expenditures. Our systems are scalable, meaning that we can expand the capacity, with limited cost and operational adjustments. We have successfully combined leading front-end,* middle-office and back-office systems into a single, integrated platform with global reach. In addition, our platform benefits from a degree of system redundancy that we believe reduces the potential for disruption that could result from a system failure. This feature is an important part of our disaster recovery capability. To date, we have not experienced a major system-related disruption.

## Entrepreneurial Culture

Many of our employees have extensive industry and product experience. We believe that our culture fosters loyalty and strengthens our relationships with our employees, which in turn has given rise to high employee retention rates.

## Experienced Management Team

Our management team has led our business through a sustained period of growth and we expect them to remain with us after our separation from Man Group. *Although we recently separated from Man Group, we are an established company with seasoned management and a long history of strong performance.* We are also accustomed to operating in a public-company environment as a division of Man Group, which is listed on the London Stock Exchange, and our operations have been subject for many years to regulatory oversight by the principal governmental and self-regulatory bodies that oversee the world's major financial markets. The members of our executive management committee have an average continuous tenure of approximately 15 years with Man Group (or an entity acquired by Man Group); and an average industry experience of approximately 26 years.

[Emphasis added.]

21

31.    Paramount among these strengths was the Company's purported ability to manage and

control risks. In this regard, the prospectus stated, in part, the following:

### Disciplined Approach to Risk

We actively manage risk on a global basis with a centralized, hands-on approach. *Our senior executives play a leading role in managing our risk exposure on a day-to-day basis. We monitor our clients' open positions— which represent our principal risk exposure—and margin levels on a real-time basis, with both sophisticated technical systems as well as continuous oversight from our highly experienced risk managers. Client positions are reviewed and margin levels adjusted both during and at the end of each trading day.* We do not rely primarily on conventional value-at-risk methodology to test our clients' exposures, as that methodology attempts to measure risk under relatively "normal" market conditions during a relatively brief period and may not always reflect significant "shock" events that may have occurred over a longer time frame. *Rather, we stress-test client positions under hypothetical "worst-case" conditions that reflect actual historical data from periods extending back a decade or longer. We believe this approach enables us to measure risk in light of a broader range of historical experience that includes more extreme conditions.* Equally important, we believe that effective risk-management requires a willingness to be selective about our clients, in particular in terms of credit and risk analysis, and in some cases to limit our clients' trading activities. *We believe that our value-added services and deep liquidity enable us to exercise a more disciplined approach to risk-management than would otherwise be the case if our client services were not as attractive to the market.* We also believe that our primary focus on brokerage services and standardized products, and the fact that our trading markets tend to be relatively liquid with readily available pricing information, enable us to effectively evaluate and manage the risks posed by our clients' positions. *In each of our last four fiscal years, our losses due to trading errors and client defaults have represented less than 2.0% of our revenues, net of interest and transaction-based expenses, with losses due solely to client defaults representing less than 0.5%.*

＊    ＊    ＊

### Risk Management

*We believe that effective risk-management is critical to the success of our business. Consequently, we devote significant resources (including investments in employees and technology) to the measurement, analysis and management of risk.* We employ 125 professionals in our compliance, risk-management and credit risk operations worldwide.

*We have established a robust, globally integrated risk-management infrastructure to monitor, evaluate and manage the principal risks we assume in conducting our business around the world.* While Man Group has historically provided us with corporate-level oversight of our global risk-management operations, following this offering, we intend to manage our global risk-management activities on a stand-alone basis with our own personnel. *Pursuant to a transitional risk services agreement with Man Group, Man Group has agreed to provide us with a license to use of a copy of the global risk-management systems and processes that will enable us, among other things, to calculate our economic capital, conduct stress-testing of our business, prepare reports supporting documentation requirements, prepare annual liquidity scenarios and test our liquidity contingency plan.* For a discussion of the group risk services agreement, see "Certain Relationships and Related Transactions—Group Risk Services Agreement."

As part of this transition, we employ a dedicated *Chief Risk Officer who is responsible for overseeing all aspects of our risk-management infrastructure and who reports directly to our Chief Operating Officer and Deputy CEO.* On a day to day basis, he manages and oversees specialist teams that continuously monitor our risk exposures around the world. These teams communicate their findings to him and to local decision-making bodies to allow us to react rapidly to address any developing risks. The Chief Risk Officer is responsible for preparing periodic global risk reports that are presented to our Global Risk Committee, which in turn reports to our Audit Committee. These reporting measures are designed to ensure that various levels of management communicate with one another regarding the evolving risks affecting our business. In addition, each business manager is required to measure and submit reports periodically to the Chief Risk Officer, who in turn reports to the Global Risk Committee, regarding its Key Risk Indicators, in a mandatory format that covers a wide range of comparative measurements, including settlement and bank account reconciliation items, error accounts and failed trades, brokerage receivables, margin calls, credit limits, personnel turnover, client complaints and infrastructure interruptions. *The Key Risk Indicator reporting process, together with our other reporting processes, are designed to enable us to assess the levels of risk present throughout our operating environment on a real-time basis and to take any necessary remedial action in a timely manner.*

[Emphasis added.]

32.    Following the close of the IPO, and following the exercise of the underwriter's over-subscription option within 30 days therefrom, on or about November 13, 2007, defendants also filed with the SEC the Company's interim financial and operational results for the third quarter of 2007,

23

the period ended September 30, 2007, pursuant to Form 10-Q,. In addition to reiterating many of the same materially false and misleading statements as were contained in the Company's IPO prospectus, the 3Q:07 Form 10-Q also stated, in part, the following:

### Basis of Presentation

The unaudited consolidated and combined financial statements are prepared in conformity with US GAAP. Management believes that these unaudited consolidated and combined financial statements include all normally recurring adjustments and accruals necessary for a fair presentation of the unaudited Consolidated and Combined Statements of Operations, Balance Sheets, Cash Flows, Changes in Stockholders' Equity/ Equity and Comprehensive Income for the periods presented. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States ("US GAAP") have been omitted as permitted by Article 10 of regulation S-X and the rules and regulations of the SEC. These Unaudited Consolidated and Combined Financial Statements should be read in conjunction with the Company's audited annual financial statements for the years ended March 31, 2007, 2006, and 2005 included in the Company's F-1 Registration Statement (File No. 333-143395) filed with the SEC on July 18, 2007.

*    *    *

The unaudited consolidated financial statements for the three months ended September 30, 2007, represent the Company's first reporting period subsequent to becoming a publicly-traded company. Prior to July 1, 2007 the Company's financial statements were prepared on a combined basis as if the Company had existed on a stand-alone basis and in conformity with US GAAP. The unaudited combined financial statements were carved out from Man Group and include the accounts of the Company and its majority and wholly owned subsidiaries, in each case using the historical basis of accounting for the results of operations and assets and liabilities of the respective businesses....

33.     The 3Q:07 Form 10-Q also reported on the Company's purported Controls and Procedures that were supposed to be in place at the time of the IPO and throughout the relevant period, in part, as follows:

### Item 4.     Controls and Procedures

24

As of the end of the period covered by this report, we evaluated, under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, the effectiveness of the design and operation of the disclosure controls and procedures, as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, of MF Global. Based upon that evaluation, our chief executive officer and chief financial officer concluded that the design and operation of the disclosure controls and procedures were effective as of the end of the period covered by this report. No significant changes were made in our internal control over financial reporting, as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, or in other factors that could significantly affect our internal control over financial reporting subsequent to the date of their evaluation.

34.    The 3Q:07 Form 10-Q also contained certifications by defendants Davis and Butte

that purported to certify the accuracy and completeness of MF Global's disclosures and reports, as

well as the adequacy and sufficiency of the Company's controls and procedures, as follows:

### Certification of the Chief Executive Officer [and Chief Financial Officer] As Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

1.    I have reviewed this Quarterly Report on Form 10-Q for the period ended September 30, 2007 of MF Global Ltd.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Registrant and we have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

25

b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 13, 2007

/s/ K EVIN R. DAVIS
Kevin R. Davis
Chief Executive Officer

*       *       *

Date: November 13, 2007

/ S /   A MY S. BUTTE
Amy S. Butte
Chief Financial Officer

### MF Global Ltd.
### Certification of the Chief Executive Officer
### As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

In connection with the Quarterly Report of MF Global Ltd. (together with its subsidiaries, the "Company") on Form 10-Q for the period ended September 30, 2007 as filed with the Securities and Exchange Commission on the date hereof (the

26

"Report"), I, Kevin R. Davis, Chief Executive Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that:

1. the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 13, 2007

/ s /   K EVIN R. D AVIS
Kevin R. Davis
Chief Executive Officer

## Certification of the Chief Financial Officer
## As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

In connection with the Quarterly Report of MF Global Ltd. (together with its subsidiaries, the "Company") on Form 10-Q for the period ended September 30, 2007 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Amy S. Butte, Chief Financial Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that:

1. the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 13, 2007

/s/ AMY S. BUTTE
Amy S. Butte
Chief Financial Officer

35.     At the time of the July 2007 IPO and at the time defendants filed the Company's

prospectus and the 3Q:07 Form 10-Q with the SEC, defendants published materially false and

misleading statements about the Company and omitted to disclose information necessary to make

27

defendants' other disclosures not materially false and misleading. As evidence of this, at the time of the July 2007 IPO and throughout the relevant period, the true but undisclosed negative conditions that existed at the time of the Offering, and that continued to adversely impact the Company after that time, included, in part, the following:

(a)     At the time of the IPO, the Company did not maintain even the most basic risk management and trading control systems or procedures, which were supposed to prevent traders and brokers from taking large, unhedged positions in markets that they had little or no trading experience;

(b)     At the time of the IPO, as a result of defendants' inability to manage and control traders and the Company's lack of reasonable risk and trading system controls and procedures, the Company was not a safe investment even for risk tolerant investors, and an investment in MF Global represented unreasonable and undisclosed risks to investors;

(c)     At the time of the IPO, the Company was *already* lacking the most basic risk management systems and procedures, and MF Global did not maintain the sophisticated risk management or loss prevention controls that it stated that it maintained within the IPO prospectus;

(d)     At the time of the IPO, MF Global's control deficiencies were much more severe than revealed, and the Company did not even maintain the most minimum standards of good corporate governance or controls and procedures, as is required by the SEC and the Company's own internal guidelines and standards of business conduct; and

(e)     At the time of the IPO, defendants had *not* conducted an adequate due diligence investigation into MF Global which would have revealed many of these issues and would

28

most likely have prevented the sale of this Company to shareholders through the public equity markets at that time, or at the inflated price at which these shares were originally sold.

## The True Financial and Operational Condition of
## MF Global is Belatedly Disclosed

36.    On February 28, 2008, however, MF Global stock plummeted -- falling over 27% or over $8.00 per share -- after defendants announced that an employee trader had lost almost $150 million in the commodities market by taking a large un-hedged position consisting of thousands of wheat contracts valued at hundreds of millions of dollars on the Chicago Board of Trade. At that time, the Company announced that it would take a charge of at least $141.5 million -- a loss equal to about $0.72 per share, or nearly half of the Company's expected profit for the full year and a loss that wiped out at least 6% of the Company's equity.

37.    Later in the day, also on February 28, 2008, *Reuters* news service published a report that provided additional information about how one trader could make an unauthorized trade that would result in losses of that magnitude. In this regard, Reuters reported that, "*[a] failure in one of the Company's retail order entry systems allowed the representative to establish significant positions in his own account which were sold later on Wednesday,* the Company said in a statement." At that time, defendants were also forced to admit that MF Global would be forced to incur the additional operating expense of engaging a "third-party risk technology consultant" to review the Company's relevant order entry systems. The Company's disclosures followed rumors that circulated the prior day of an "erroneous" trade.

38.    While the Company's statement seemed to suggest that this "failure" was a technical one, on a conference call later that same day the failure was a described as a "procedural matter" that

29

has since been changed. Moreover, by that time, market commentators had also reported that the $141 million charge announced by MF Global represented approximately 6% of MF Global's total equity -- lost from "betting" on the price of wheat which has been surging of late with world wheat supplies at 30-year lows. Again, when asked on the defendant's conference call about the kind of collateral the broker had, defendant Davis, the firm's Chief Executive, said that *the trader in question "didn't have enough capital to support even a fraction" of his position*. The Trader in question, conversely, was quoted in the *Wall Street Journal* as stating that *MF Gloal's computer system had problems in "setting limits."*

39.     Moreover, because this loss translated to about $0.72 per share -- or nearly half of the Company's expected profit for the year -- and because the loss represented at least 6% of the equity of the Company, MF Global's share price immediately declined by approximately 28% on February 28, 2008. MF Global stock collapsed as over 15.745 million shares traded that day, falling over $8.00 per share in one day to close at $21.19 per share -- well below the $30.00 IPO price at which defendant Man Group sold over $3.213 billion of its shares only months before. Following this dramatic share price decline, analysts noted that "questions raised around the Company's risk-management practices is likely to keep the stock depressed for some time."

## CAUSATION AND ECONOMIC LOSS

40.     In connection with the July 2007 MF Global IPO, defendants signed a materially false and misleading registration statement and filed with the SEC and made available to shareholders a materially false and misleading prospectus. These filings were essential in allowing defendants to complete the IPO of 97.387 million MF Global shares and raise over $3.2213 billion and to create a public market for trading in Company stock immediately thereafter.

30

41.     On March 20, 2007, when defendants' prior misrepresentations and illegal and improper conduct came to be revealed to investors, shares of MF Global declined precipitously -- evidence that the prior artificial inflation in the price of Company shares was eradicated. As a result of their purchases of MF Global stock in connection with the IPO, including those who purchased shares traceable to the Offering in the public markets immediately thereafter, plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

42.     By improperly characterizing the Company's risk management and trading control procedures, the defendants presented a misleading image of MF Global's business and future growth prospects. Within the IPO prospectus and registration statement, defendants repeatedly emphasized the ability of the Company to monitor and control its diverse trading positions and that the Company had already installed the systems and procedures necessary to accomplish these important tasks and also emphasized that it consistently reported risks, costs, and expenses within expectations sponsored and/or endorsed by defendants. These claims caused and maintained the artificial inflation in MF Global's stock at the time of the IPO and thereafter until the truth about the Company was ultimately revealed to investors.

43.     On February 28, 2007, however, investors learned the truth about the Company and learned that defendants did not have systems and procedures in place to prevent traders from taking massive, unhedged and under-capitalized trading positions. These belated revelations also evidenced defendants' prior misrepresentation of MF Global's business prospects via defendants' false statements.

44.     As investors and the market ultimately learned, the Company's risk management and trading control systems and procedures were ineffective and/or nonexistent and the Company's

31

results of operations were inaccurate. As this adverse information became known to investors, the prior artificial inflation was immediately eliminated from MF Global's share price and shareholders were damaged as a result.

45.    As a direct result of investors learning the truth about the Company, on February 28, 2008, MF Global' stock price collapsed to below $21.00 per share from above $29.00 per share -- a decline of almost 30% -- on very heavy trading volume of over 15.74 million shares. This dramatic share price decline eradicated much of the artificial inflation from MF Global's share price, causing real economic loss to investors who purchased this stock in, or in connection with, the MF Global IPO. The following day, as the Company was downgraded by the major ratings agencies, shares of MF Global fell an additional 20%, from a prior day's closing price of $21.00, to a trading low of $14.00 per share -- down another $7.00 per share.

46.    The decline in MF Global' stock price following the revelation of defendants' belated disclosures on February 28, 2008 was a direct result of the nature and extent of defendants' misrepresentations and omissions contained in the IPO prospectus becoming known to investors and to the market. The timing and magnitude of MF Global's stock price decline the following day, when trading resumed, negates any inference that the losses suffered by plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to defendants' illegal and improper conduct. During the same period in which MF Global's share price fell almost 30% as a result of defendants' misrepresentations and omissions being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

32

The economic loss, *i.e.* damages, suffered by plaintiff and other members of the Class was a direct result of defendants' misrepresentations and omissions being revealed to investors and the subsequent significant decline in the value of the Company's shares was also the direct result of defendants' prior misstatements and omissions being revealed.

## CLASS ACTION ALLEGATIONS

47.     This is a class action on behalf of all persons who purchased MF Global common stock, pursuant to the July 2007 IPO (the "Class"), excluding defendants. Class members are so numerous that joinder of them all is impracticable.

48.     Common questions of law and fact predominate and include whether defendants: (i) violated the Securities Act; (ii) whether the MF Global IPO registration statement and prospectus misrepresented material facts; and (iii) the extent of and appropriate measure of damages.

49.     Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIM FOR RELIEF

### COUNT I
### Violations of §11 of the Securities Act Against All Defendants

50.     Plaintiff incorporates each and every allegation above as if stated herein.

51.     The Individual Defendants each signed MF Global's IPO registration statement and/or filed that prospectus with the SEC and distributed it to investors. The Underwriter Defendants each permitted their names to be included on the cover of the prospectus as an underwriter.

33

52.     On or about July 18, 2007, the defendants named in this Claim for Relief completed an IPO of 97.4 million shares of MF Global stock and an additional 9.74 million shares allotted to underwriters in an over-subscription option at $30.00 per share for total proceeds of at least $3.213 billion.

53.     Each of the statements alleged herein relating to MF Global's prospects and financial results made in the July 2007 prospectus and registration statement were false or misleading when issued. The true but concealed fact was that MF Global did not maintain sufficient trading control or risk management controls or procedures which had already severely and adversely undermined the Company prior to the Offering and which foreseeably would continue to hinder the Company in the near-term. These omissions were a violation of SEC Regulation S-K, Item 303(a), which requires that trends which will have a material effect on a registrant's results be disclosed.

54.     All defendants named in this Claim for Relief, with the exception of MF Global, the issuer (whose liability for the misstatements is absolute), owed to the purchasers of the stock, including plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the registration statement and prospectus at the time it became effective to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

55.     The officers and directors of MF Global who were signatories to the registration statement and the Underwriter Defendants were responsible for the preparation of the prospectus and the registration statement. By virtue of the material misrepresentations contained in the registration statement and prospectus, plaintiff and the Class have been damaged.

34

56.    By reason of the conduct herein alleged, each of the defendants named in this Claim for Relief violated §11 of the Securities Act.

## COUNT II
### Violation of §15 of the Securities ActAgainst the Individual Defendants and Man Group

57.    Plaintiff incorporates each and every allegation above as if stated herein.

58.    This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants and defendant Man Group.

59.    Each of the Individual Defendants and defendant Man Group was a culpable participant in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the registration statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

60.    Defendant Man Group and the Individual Defendants, by reason of their stock ownership and positions with MF Global, were each controlling persons of MF Global (which violated §11) and are therefore also liable under §15 of the Securities Act.

## COUNT III
### Violation of Section 12(a)(2) of the Securities Act Against All Defendants

77.    Plaintiff incorporates by reference each and every allegation contained above, as if set forth herein. This count is predicated upon defendants' strict liability for making false and materially misleading statements in the registration statement and prospectus. This Count is asserted by plaintiff against all defendants by and on behalf of persons who acquired shares of the Company pursuant to the false registration statement and prospectus issued in connection with IPO.

78.    This Count is brought by plaintiff pursuant to Section 12(a)(2) of the Securities Act on behalf of all purchasers of MF Global common stock in connection with and traceable to the

35

Offering. This cause of action is brought against all defendants.

79.    Defendants were sellers, offerors, and/or solicitors of sales of the MF Global shares offered pursuant to the IPO.

80.    The MF Global IPO registration statement and prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. Defendants' actions of solicitation included participating in the preparation of the false and misleading prospectus and registration statement.

81.    The defendants owed to the purchasers of MF Global common stock which were sold in the July 2007 IPO the duty to make a reasonable and diligent investigation of the statements contained in the prospectus and registration statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering materials as set forth above.

82.    Plaintiff and other members of the Class purchased or otherwise acquired MF Global common stock pursuant to and traceable to the defective prospectus. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the prospectus.

83.    Plaintiff, individually and representatively, hereby offers to tender to defendants those securities which plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

84.    By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act. Accordingly, plaintiff and members of the Class who hold MF Global common stock purchased in the IPO have the right to rescind and recover

the consideration paid for their shares and hereby elect to rescind and tender their shares to the defendants sued herein. Plaintiff and Class members who have sold their MF Global shares are entitled to rescissory damages.

85.    Less than three years elapsed from the time that the securities upon which this count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when plaintiff discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

## PRAYER

**WHEREFORE**, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

Plaintiff hereby demands a trial by jury.

Dated: March 19, 2008

Respectfully Submitted,

Kim E. Miller
**KAHN GAUTHIER SWICK, LLC**
12 East 41th Street – 12 Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

- and -

Lewis Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street - Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

**Attorneys for Plaintiff & the Class**

## CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF

FRANK MATASSA (name) ("plaintiff") declares, as to the claims asserted under the federal securities law, that:

1.    Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

2.    Plaintiff did not purchase securities of MF Global Ltd. at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the Class Period, plaintiff has executed transactions in the securities of MF Global Ltd. as follows. See Attached Schedule.

5.    In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.    Plaintiff will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _____ 3|11 _____ , 2008

Plaintiff

Name of plaintiff: FRANK MATASSA
Schedule of plaintiff's Transaction(s) in
MF Global Ltd.

Purchase(s):

| Date | Units | Price |
|------|-------|-------|
| 7/19/07 | 600 | $30.00 |

Sale(s):

| Date | Units | Price |
|------|-------|-------|